IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
GREEN BAY DIVISION

---

BROWN COUNTY TAXPAYERS ASSOCIATION,

        Plaintiff,

    v.                               Case No. 22-cv-01171

JOSEPH R. BIDEN, JR., et al.

        Defendants.

---

BRIEF IN SUPPORT OF MOTIONS FOR
TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

---

WISCONSIN INSTITUTE FOR LAW & LIBERTY

Rick Esenberg
*rick@will-law.org*

Daniel P. Lennington
*dan@will-law.org*

330 E. Kilbourn, Suite 725
Milwaukee, WI 53202-3141
Phone: 414-727-9455
Fax: 414-727-6385

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................. 1

FACTS ................................................................................................................... 3

  I.   The United States Treasury's $1.62 Trillion Student Loan Portfolio ................ 3

  II.  Defendants' One-Time Student Loan Debt Relief Plan ................................. 4

  III. Defendants Purported Authority for the Plan: the HEROES Act ..................... 6

  IV. Plaintiff's Injuries ...................................................................................... 8

ARGUMENT .......................................................................................................... 9

  I.   Standard of Review ................................................................................... 9

  II.  Plaintiff Has Taxpayer Standing Because it Challenges an Illegal
       Exercise of the Congressional Spending Power and a Violation of
       Specific Constitutional Prohibitions on Spending .............................................. 10

      A.    Federal Taxpayer Standing ......................................................................... 11

      B.    Plaintiff's Taxpayer Standing ................................................................... 16

  III. Plaintiff is Likely to Succeed on its Claim that the Student Loan Relief
       Program Exceeds Defendants' Constitutional and Statutory Authority. ......... 22

      A.    The Major-Questions Doctrine Applies ....................................................... 23

      B.    Defendants Cannot Point to Any Clear Congressional Authorization
           for This Debt Forgiveness. On the Contrary, Defendants' Plan
           Violates Explicit Constitutional Prohibitions ............................................. 24

  IV. Plaintiff Will Be Irreparably Harmed if an Injunction is not Granted ............ 27

  V.  The Public Interest and Balance of Harms Weigh Heavily in Favor of an
      Injunction ................................................................................................. 28

CONCLUSION ...................................................................................................... 29

Case 1:22-cv-01171-WCG   Filed 10/04/22   Page 2 of 32   Document 6

# INTRODUCTION

"With all its defects, delays and inconveniences, men have discovered no technique for long preserving free government except that the Executive be under the law, and that the law be made by parliamentary deliberations." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 655 (Jackson, J., concurring).

On August 24, 2022, President Biden announced the creation of a massive new federal program that could cost taxpayers over $1 trillion. It's called the "One-Time Student Loan Debt Relief Plan." The problem is that President Biden created this program unilaterally without any legal authority from Congress. That's not how lawmaking works in America. Article I, Section 1 of our Constitution therefore vests *all* legislative power in Congress. President Biden's fiat here is nothing more than a modern-day Stamp Act—a massive taxing and spending policy passed without participation of the People's representatives.

In defense of this new program, Defendants propose a fig leaf: they say the trillion-dollar program is authorized by the 9/11-era HEROES Act, which allows the President to forgive loans when "necessary in connection with a war or other military operation or national emergency." 20 U.S.C. § 1098bb(a)(1). Because of the COVID-19 pandemic (which the President himself recently declared to be "over"[1]), we are in an emergency, they say, and therefore student loan debt may be wiped away with the

---

[1] *See* "How Biden's declaring the pandemic 'over' complicates efforts to fight COVID," https://www.npr.org/sections/health-shots/2022/09/20/1123883468/biden-pandemic-over-complicates-fight (President Biden quoted as saying "We're still doing a lot of work on it. But the pandemic is over. If you notice, no one's wearing masks. Everybody seems to be in pretty good shape.")

stroke of a pen (or more likely the click of a mouse) in the coming days. Such an argument would be laughable if it were not so serious a violation of the constitutional separation of powers. As confirmed by officials from the two preceding administrations, the HEROES Act does no such thing. The President is acting without any authority, and the HEROES Act is no justification.

The public response to this unusually blatant disregard of constitutional duty and cynical usurpation of legislative power has highlighted the concept of standing. The argument has been made that no one except the lender is harmed by the forgiveness of someone else's debt, and therefore only the government who forgave these loans is harmed by the President's decision to, in effect, spend $1 trillion unlawfully. This simply can't be. And, as we shall see, it is not.

Defendants' plan to start forgiving loans—automatically and without notice—will begin within the coming days unless the federal judiciary steps in and stops them. As this Court aptly recognized in *Faust v. Vilsack*, the "purpose of a temporary restraining order is to preserve the status quo pending a decision on the merits. Once a loan is forgiven, it cannot easily be undone. A narrow temporary restraining order resolves any threat of serious delay." *Faust v. Vilsack*, 519 F. Supp. 3d 470, 477–78 (E.D. Wis. 2021). For the same reasons, Plaintiff requests an injunction to prevent something quite irreversible and damaging to the separation of powers: Defendants' promised action of wiping away perhaps more than $1 trillion of assets held by the United States Treasury without any legal authority.

Plaintiff therefore respectfully requests expedited consideration of this motion and an injunction enjoining these officials from violating the Constitution.

## FACTS

### I. The United States Treasury's $1.62 Trillion Student Loan Portfolio

The federal government runs three student loan programs. Under the Federal Direct Loan Program, the government makes student loans directly to students and parents, who must then repay the government. *See* 20 U.S.C. §§ 1087a –1087j. Under the Federal Family Education Loan (FFEL) Program and the Federal Perkins Loan Program, non-federal lenders make student loans and then transfer those student loans to the federal government. *See id.* §§ 1071–1087-4; *id.* §§ 1087aa –1087ii. According to the Department of Education, about 43 million borrowers have loans under these three student loan programs, and $1.62 trillion is owed to the U.S. Treasury. *See* U.S. Dep't of Education, Federal Student Loan Portfolio, Summary.[2]

The Higher Education Act of 1965 specifies the terms and conditions of each type of federal loan and the consequences of a borrower's failure to make payment. *See, e.g.*, 20 U.S.C. §§ 1080, 1087e, 1087dd. Critically, in this law, Congress provided several generous exceptions and provisions allowing repayment plans, reduced interest rates, loan consolidation, repayment incentives, deferment, borrower defenses, forbearance, and even loan cancellations. *See generally* 20 U.S.C. § 1087e, *see e.g.*, subsection (m) (allowing cancellation for public service employees). In short, when Congress wants to cancel or modify a loan, it knows precisely how to do it.

---

[2] https://studentaid.gov/data-center/student/portfolio

Finally, the Department of Education has promulgated a series of regulations confirming borrowers' obligations to repay student loan debt. *See, e.g.,* 34 C.F.R. § 682.102 (providing that "[a] borrower is obligated to repay the full amount" of a loan under the FFEL Program); id. § 685.207 (providing that "[a] borrower is obligated to repay the full amount of a Direct Loan"). The regulations also explain how loans may be cancelled or discharged under law. *See, e.g.*, 34 C.F.R. § 682.402 (FFEL discharges); *id.* §§ 685.212–218 (Direct Loan discharges).

## II.    Defendants' One-Time Student Loan Debt Relief Plan

On August 24, 2022, President Biden announced his "Student Debt Relief Plan." The plan has three parts: (1) student loan forgiveness, called the "One-Time Student Loan Debt Relief Plan," (2) cutting monthly payments and adjusting the Public Service Loan Forgiveness program, and (3) plans to double Pell grants and make community college free. *See* White House, Fact Sheet: President Biden Announces Student Loan Relief for Borrowers Who Need It Most.[3] Defendants' plan to unilaterally run up what could be a thirteen-figure debt under the guise of student loan forgiveness is the subject of this lawsuit and motion.

The President's plan, characterized as the "One-Time Student Loan Debt Relief" plan, will happen in the coming days as follows:

> The U.S. Department of Education (ED) will provide up to $20,000 in debt relief to Federal Pell Grant recipients and up to $10,000 in debt relief to non-Pell Grant recipients. Borrowers with loans held by ED are

---

[3] https://www.whitehouse.gov/briefing-room/statements-releases/2022/08/24/fact-sheet-president-biden-announces-student-loan-relief-for-borrowers-who-need-it-most/

eligible for this relief if their individual income is less than $125,000 (or $250,000 for households).

*See* Federal Student Aid, One-Time Student Debt Relief Plan.[4] This forgiveness will apply to all loans in the federal portfolio described above: Federal Direct Loan Program loans, FFEL program loans, Perkins Loan Program loans, and defaulted loans held by the United States. *Id.*

There are two mechanisms that will trigger this loan forgiveness. First, some borrowers will have their loans forgiven following the submission of an application. "The application will be available online in October 2022." *Id.* Second, and most importantly for purposes of this motion, "around 8 million borrowers" will have their loans forgiven automatically "without applying." *Id.* (FAQ, "Will any borrowers receive debt relief without applying?"). Defendants' hair-trigger decision to wipe away perhaps $1 trillion of assets of the United States Treasury with little or no notice, public input, or most importantly congressional action, necessitates this emergency request for an injunction.

As part of the justification for this plan, Defendants announced an explicit racial motive. The Student Debt Relief Plan is motivated by a desire to "advance racial equity" and "narrow the racial wealth gap." To achieve equity, the plan, according to the White House, is "more likely" to help "Black students," "Black borrowers," and "other borrowers of color." *See* White House, Fact Sheet, *supra*. The White House favorably cited the Urban Institute, which claims that Defendants' chosen student loan forgiveness plan will "disproportionately benefit Black

---

[4] https://studentaid.gov/debt-relief-announcement/one-time-cancellation.

borrowers" and would be "far more racially progressive than broad forgiveness." Urban Institute, A More Targeted Approach to Student Loan Forgiveness (April 12, 2021).[5]

Defendants' Student Debt Relief Plan may cost over $1 trillion. According to the University of Pennsylvania, the debt cancellation will cost approximately $519 billion, but it is possible that "total plan costs could exceed $1 trillion." *See* University of Pennsylvania, Penn Wharton Budget Model, The Biden Student Loan Forgiveness Plan (Aug. 26, 2022).[6] In other words, the Student Debt Relief Plan is a massive new federal spending program on par with the Bipartisan Infrastructure Act ($1 trillion), which was touted by the White House as a "once-in-a-generation" and "transformational" federal law.[7] In a different way, the Student Debt Relief Plan— which would wipe away perhaps $1 trillion from the United States' balance sheets by unchecked presidential fiat—will be transformational to our separation of powers, the rule of law, and the power of the President.

## III. Defendants Purported Authority for the Plan: the HEROES Act

Defendants offer a single legal authority in support of their plan: the Higher Education Relief Opportunities for Students Act of 2003 (the HEROES Act). *See* Notice of Debt Cancellation Legal Memorandum, 87 FR 52943-02, 2022 WL 3716314;

---

[5] https://www.urban.org/urban-wire/more-targeted-approach-student-loan-forgiveness

[6] https://budgetmodel.wharton.upenn.edu/issues/2022/8/26/biden-student-loan-forgiveness

[7] https://www.whitehouse.gov/bipartisan-infrastructure-law/

U.S. Department of Justice, Use of the HEROES Act of 2003 to Cancel the Principal Amounts of Student Loans (Aug. 23, 2022).[8] The purpose of HEROES Act, according to Congressional findings, was to support "our nation's defense," "protect the freedom and secure the safety of its citizens," and to support the "men and women of the United States military [who] put their lives on hold, leave their families, jobs, and postsecondary education in order to serve their country and do so with distinction." 20 U.S.C.A. § 1098aa(b). In the Act, Congress found that "[t]here is no more important cause for this Congress than to support the members of the United States military and provide assistance with their transition into and out of active duty and active service." *Id*. at (b)(6).

Under the HEROES Act, the Secretary of Education may "waive or modify any statutory or regulatory provision applicable" to federal student loan programs "as the Secretary deems necessary in connection with a war or other military operation or national emergency to provide the waivers or modifications authorized by paragraph (2)." 20 U.S.C.A. § 1098bb(a)(1). Under Paragraph (2), the Secretary's action is justified only if "recipients of student financial assistance under title IV of the Act who are affected individuals are not placed in a worse position financially in relation to that financial assistance because of their status as affected individuals." 20 U.S.C.A. § 1098bb(a)(2). Instead of claiming that the HEROES Act was passed to support the "men and women of the United States military" (as it says in the law), Defendants instead now claims that the HEROES Act allows broad student loan

---

[8] https://www.justice.gov/olc/file/1528451/download

forgiveness for anyone "who suffered financial hardship because of COVID-19"—in other words, any Americans the President deems worthy. *See Notice of Debt Cancellation Legal Memorandum*, 87 Fed. Reg. 52,943 (Aug. 30, 2022). In the President's view, the HEROES Act empowers him to forgive the loans of anyone who has been affected by something that can be called an emergency. It does not. And if it did, it would be unconstitutional.

## IV. Plaintiff's Injuries

The Brown County Taxpayers Association (BCTA) is an association of over 100 dues-paying member who pay federal taxes. Doc. 1:¶6. BCTA's mission is to promote individual freedom and citizen responsibility; limited government that is fiscally responsible, transparent, and accountable to the people; and economic policy that encourages free markets, promotes entrepreneurism, respects property rights, and expands opportunity for the people of Brown County to prosper and live free, productive lives. Doc. 1:¶5. BCTA and its members advocate in favor of fiscally responsible federal tax policy. BCTA members are specifically concerned about the rising federal debt and that debt's impact on their future tax liability. Defendants' One-Time Student Loan Debt Relief Plan will, if implemented, negatively impact BCTA and each of its members, who will pay higher taxes and live in an America that is less prosperous, more fiscally irresponsible, and burdened by a higher federal debt. Doc. 1:¶7. Moreover, another trillion dollars in debt added through the unilateral action of the President would force BTCA to alter its advocacy activities. Doc. 1:¶7. In the Complaint, BTCA affirmatively alleges as follows:

As an association of federal taxpayers, BTCA affirmatively alleges, on behalf of its members, that Defendants have unconstitutionally and unlawfully exercised "congressional power under the taxing and spending clause of Art. 1, § 8, of the Constitution" by forgiving student loan debt owed to the federal treasury, which is an appropriation of federal funds, 31 U.S.C. §§ 1301(a), 1341(a)(1)(A), and therefore "exceed[ed] specific constitutional limitations imposed upon the exercise" of that power, *Flast v. Cohen*, 392 U.S. 83, 102-103 (1968), by violating the Appropriations Clause, Art. I, § 9, as informed by the Major Questions Doctrine, *West Virginia v. EPA*, 142 S. Ct. 2587 (2022), and the Equal Protection doctrine, *Miller v. Johnson*, 515 U.S. 900 (1995), by relying on an improper racially discriminatory motive.

Doc. 1: ¶8.

## ARGUMENT

## I.     Standard of Review

The standards for issuing temporary restraining orders are identical to the standards for preliminary injunctions. *See Long v. Bd. of Educ., Dist*. 128, 167 F. Supp. 2d 988, 990 (N.D. Ill. 2001). A party seeking a temporary restraining order or preliminary injunction must demonstrate "(1) some likelihood of succeeding on the merits, and (2) that it has no adequate remedy at law and will suffer irreparable harm if preliminary relief is denied." *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir. 1992) (citation omitted). If a plaintiff meets these factors, the court proceeds to "a balancing phase, where it must then consider: (3) the irreparable harm the non-moving party will suffer if preliminary relief is granted, balancing that harm against the irreparable harm to the moving party if relief is denied; and (4) the public interest, meaning the consequences of granting or denying the injunction to non-parties." *Cassell v. Snyder*s, 990 F.3d 539, 545 (7th Cir. 2021).

## II. Plaintiff Has Taxpayer Standing Because it Challenges an Illegal Exercise of the Congressional Spending Power and a Violation of Specific Constitutional Prohibitions on Spending

Whether Plaintiff has standing is the most critical, and perhaps the only serious issue in this case, as Defendants have little chance of success on the merits. Standing continues to be a stumbling block for plaintiffs wishing to challenge this plan because Defendants, in response to lawsuits, have quickly and unilaterally made changes in an attempt to blunt the lawsuits. For example, after the Pacific Legal Foundation filed a challenge on behalf of one of its employees who would undoubtedly have faced a tax penalty because of the plan's details, Defendants immediately added an "opt-out" to nullify that plaintiffs' standing. *See Garrison v. U.S. Dep't of Ed.*, 1:22-cv-1895 (S.D. Ind. Sept. 27, 2022) (motion for TRO denied because of Defendants' change to the program, *see* Doc. 16). And then after six states filed a lawsuit to challenge the plan based, in part, on the states' operation of loan servicing agencies, Defendants, notwithstanding the "emergency" for all due to COVID, changed the plan yet again to exclude some debtors whose loans are serviced by such agencies. *See State of Nebraska v. Biden*, No. 4:22-cv-1040 (E.D. Mo. Sept. 29, 2022); *see* NPR, "In a reversal, the Education Dept. is excluding many from student loan relief," (Sept. 30, 2022).[9] The President simply doesn't want to defend his action in court. Ever.

The argument that a President may unilaterally spend up to a trillion dollars through executive fiat, and that *no one* has standing to challenge such an action because of bureaucratic gamesmanship, is offensive to the very notions of a well-

---

[9] https://www.npr.org/2022/09/29/1125923528/biden-student-loans-debt-cancellation-ffel-perkins

ordered constitutional republic. It is Defendants' apparent position that a future President could simply order the IRS to impose a $1 trillion tax cut and that because of Defendants' cramped understanding of standing, the program would be lawful because no one could challenge it. This simply cannot be the case. The federal judiciary is not powerless and cannot be relegated to mere bystander observing constitutional infractions of the highest orders. "It is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. 137, 177 (1803).

Plaintiff brings this taxpayer standing claim under *Flast v. Cohen*, *infra*, which endows taxpayers with legal standing to challenge a President who usurps congressional spending powers and at the same time violates an express constitutional prohibition on that spending power. The arguments below provide an application in harmony with *Flast*, and to the extent Plaintiff argues for a reasonable expansion of taxpayer standing, this argument provides a cabined expansion to be used only in the most extraordinary cases, as is the case here.

### A.    Federal Taxpayer Standing

In 1923, the United States Supreme Court ruled that a federal taxpayer did not have standing to challenge the Maternity Act of 1921. *Frothingham v. Mellon*, 262 U.S. 447 (1923). The Court reasoned that the taxpayer's "interest in the moneys of the treasury . . . is comparatively minute and indeterminable" and that "the effect upon future taxation, of any payment out of the [Treasury's] funds, . . . [is] remote, fluctuating and uncertain." *Id* at 486–87.

Four decades later, the Court reconsidered taxpayer standing and whether the "Frothingham barrier" should be "lowered." *Flast v. Cohen*, 392 U.S. 83, 85 (1968). The Court found that it should. Recounting "confusion" and "considerable criticism" of an absolute bar to taxpayer standing, the Court decided that the *per se* rule on taxpayer standing was not a constitutional rule. *Id.* at 92. The taxpayer-standing bar, according to the Court, is based on "pure policy considerations." *Id* at 93. For example, "Frothingham was denied standing not because she was a taxpayer but because her tax bill was not large enough." *Id.* The *Frothingham* court also based its decision on concerns that general taxpayer standing would "open the door of federal courts to countless such suits." *Id.* The Court rejected these concerns in light of "modern conditions" where some taxpayers have significant federal tax liability, and that class action rules have mitigated the concern about "countless similar suits." *Id.* at 94.

The *Flast* Court emphatically rejected the concept that "under no circumstances should standing be conferred on federal taxpayers to challenge a federal taxing or spending program." *Id.* at 98. The Court explained that the simple question posed from the standing inquiry is whether the plaintiff "is a proper party to maintain the action." *Id.* at 100. And when framed in that light, "A taxpayer may or may not have the requisite personal stake in the outcome, depending upon the circumstances of the particular case." *Id.* at 101.

The Court then announced this two-part rule, which remains binding Supreme Court precedent. First, "a taxpayer will be a proper party to allege the unconstitutionality only of exercises of congressional power under the taxing and

spending clause of Art. 1, § 8, of the Constitution." *Id*. at 102. "It will not be sufficient to allege an incidental expenditure of tax funds in the administration of an essentially regulatory statute." *Id*. Second, "the taxpayer must establish a nexus between that status and the precise nature of the constitutional infringement alleged." *Id*. "Under this requirement, the taxpayer must show that the challenged enactment exceeds specific constitutional limitations imposed upon the exercise of the congressional taxing and spending power and not simply that the enactment is generally beyond the powers delegated to Congress by Art. I, § 8." *Id*. at 102–03. "When both nexuses are established, the litigant will have shown a taxpayer's stake in the outcome of the controversy and will be a proper and appropriate party to invoke a federal court's jurisdiction." *Id*. at 103. Put differently, standing under *Flast* does not empower all taxpayers to challenge any unlawful use of taxpayer funds. It is limited to the enforcement of limits imposed directly on the taxing and spending power. In this case, that limitation is the requirement that only Congress can create new spending laws, and that federal spending cannot violate specific provisions such as the Appropriations Clause and the Equal Protection doctrine, as explained below.

After laying out the two conditions for taxpayer standing, *Flast* considered them together, explaining that the plaintiffs suffered a particular injury for standing purposes when, in violation of the Establishment Clause and by means of "the taxing and spending power," their property is transferred through the Government's Treasury to a religious entity. *Id*. at 105–106. "The taxpayer's allegation in such cases would be that his tax money is being extracted and spent in violation of specific

constitutional protections against such abuses of legislative power." *Id.* at 106. *Flast* thus "understood the 'injury' alleged in Establishment Clause challenges to federal spending to be the very 'extract[ion] and spen[ding]' of 'tax money' in aid of religion alleged by a plaintiff." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 348 (2006) (quoting *Flast*, 392 U.S. at 106). "Such an injury," *Flast* continued, is unlike "generalized grievances about the conduct of government" and so is "appropriate for judicial redress." *Flast,* 392 U.S. at 106. Of particular note, *Flast* found support for taxpayer standing in the "history of the Establishment Clause," especially contemporary founding documents, in particular, the writings of James Madison and the debate over public funding of religious institutions. *Flast* was thus informed by "the specific evils" identified in the public arguments of "those who drafted the Establishment Clause and fought for its adoption." *Id.* at 114-15.

Since *Flast*, the Court has attempted to apply this two-part test. Admittedly, many taxpayers cannot meet the requirements. In 2007, a plurality of the Court found that the Freedom from Religion Foundation did not have standing to challenge the President's "faith-based initiatives." A plurality opinion found it dispositive that the money used for the initiatives was not from "specifically appropriat[ed] money. Instead, their activities are funded through general Executive Branch appropriations." *Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587, 595, 604–5 (2007) (reaffirming the *Flast* test and stating "the link between congressional action and constitutional violation that supported taxpayer standing in *Flast* is missing here"); *see also Arizona Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 138 (2011)

("The taxpayers have not shown that any interest they have in protecting the state treasury would be advanced."). In other words, the problem in *Hein* was not that the appropriation had been improperly enacted, but that a lawful appropriation was being used in a way alleged to violate the Constitution.

Two justices have advocated overruling *Flast*, yet a majority of justices have rejected that suggestion. *See Hein,* 551 U.S. at 637 (2007) (Scalia, J., and Thomas, J., dissenting) *("Flast* should be overruled"). *Flast* and its two-part test, therefore, remain the law of the land on taxpayer standing.

Plaintiff acknowledges that the Seventh Circuit has remarked, "taxpayers continue to have standing to sue for injunctive relief against specific congressional appropriations alleged to violate the Establishment Clause, but that is all." *Laskowski v. Spellings*, 546 F.3d 822, 827 (7th Cir. 2008). And this Court has specifically referenced that characterization. *See Sebring v. Milwaukee Pub. Sch.*, 569 F. Supp. 3d 767, 778 (E.D. Wis. 2021). But with respect, Plaintiff asserts that *Flast*'s two-part test remains good law and that no Supreme Court decision has slammed the door on application of that test outside of the Establishment Clause context. *See Hinrichs v. Speaker of House of Representatives of Indiana Gen. Assembly*, 506 F.3d 584, 598 (7th Cir. 2007) (taxpayers "must establish the requisite nexus between their status and the challenged enactment in order to meet the test articulated in *Flast.*"). To be sure, no court has yet to apply *Flast* as advocated here by Plaintiff. But nonetheless, Supreme Court cases faithfully apply the two-part test and Plaintiff

contends that such an analysis, when applied to the facts of this case, will result in a finding of taxpayer standing.

## B. Plaintiff's Taxpayer Standing

Plaintiff can demonstrate taxpayer standing here, or at the very least, make a good faith argument for a logical, cabined expansion of the two-part test announced in *Flast*.

First, in this case, Plaintiff challenges the exercise of "congressional power under the taxing and spending clause of Art. I, § 8, of the Constitution." *Flast,* 392 U.S. at 102. Specifically, Plaintiff alleges that Defendants, as Executive Branch officials, have usurped congressional powers under Art. I, § 8, and created a program that obligates federal taxes and erases federal assets (in the form of debt) without any authority whatsoever. Doc. 1:¶¶8, 29–35. Only Congress may tax, spend, pay debts, and forgive debts. *See Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 213 (2013) (congressional power to spend includes "the authority to impose" terms on their use); *accord S. Dakota v. Dole*, 483 U.S. 203, 212 (1987) (Spending Clause power includes the power to "attach conditions on the receipt of federal funds."). Yet Defendants are exercising this power through the creation and execution of an approximately $1 trillion student loan forgiveness plan without any statutory authority, as described more fully below. As an association of taxpayers, Plaintiff has the legitimate expectation that its members' taxes will be spent according to lawful appropriations under the Constitution, not through executive fiat. As the Court said in *Flast,* "a taxpayer will be a proper party to allege the

unconstitutionality only of *exercises of congressional power*." *Flast*, 392 U.S. at 102 (emphasis added). Here, Defendants are unconstitutionally exercising that congressional power. Doc. 1; ¶¶34–35.

To the extent Defendants argue that *Flast*'s language is limited to an exercise of power "by Congress," *see, e.g., id.* at 104, such a distinction makes little sense. Under that rigid framework, a taxpayer could challenge congressional appropriations directly to a church, but a taxpayer could *not* challenge a President who—without Congressional authority—orders the Department of Treasury to send checks to all Christian Churches in America. As another example closer to the present case, if Congress passed a law forgiving student loans only to Christian students, then a taxpayer would have taxpayer standing under current precedent. But if the President did the same thing, there would be no taxpayer standing under a cramped reading of existing precedent. But under *Flast*'s two-part test, a taxpayer would clearly have standing in both cases because *Flast*'s concern was the unlawful exercise of the taxing and spending power, which is precisely the issue in this case.

Second, Plaintiff alleges that "the challenged enactment exceeds specific constitutional limitations imposed upon the exercise of the congressional taxing and spending power." *Flast*, 392 U.S. at 102–03. There are at least two specific constitutional limitations on Defendants' plan in this case.

1. **The Appropriations Clause.** The Constitution specifically limits presidential powers to only those authorized by Congress or the Constitution. The President's "power, if any, to issue [an] order must stem either from an act of

Congress or from the Constitution itself." *Youngstown Sheet & Tube Co.*, 343 U.S. at 585. "Agencies have only those powers given to them by Congress." *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022). When "taxing and spending power" is exercised, it must be in conformity with the rest of Article I, specifically the Appropriations Clause. The Appropriations Clause prevents the Executive Branch from obligating the Government to pay money without statutory authority: "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. 1, § 9, cl. 7. "Congress's control over federal expenditures is absolute." *U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1348 (D.C. Cir. 2012) (citation omitted).

In 2012, then-Judge Kavanaugh wrote that the Appropriations Clause is a "bulwark of the Constitution's separation of powers among the three branches of the National Government." *U.S. Dep't of Navy*, 665 F.3d at 1347. Quoting Joseph Story's *Commentaries on the Constitution*, Judge Kavanagh remarked, "If not for the Appropriations Clause, the executive would possess an unbounded power over the public purse of the nation; and might apply all its monied resources at his pleasure." *Id.* (citation omitted). This principle has echoed through Supreme Court decisions since the 19th Century: "However much money may be in the Treasury at any one time, not a dollar of it can be used in the payment of any thing not thus previously sanctioned. Any other course would give to the fiscal officers a most dangerous discretion." *Reeside v. Walker*, 52 U.S. 272, 291 (1851). Critically, Congress itself has elaborated on the Appropriations Clause limitations by declaring that appropriated

funds may only be applied "to the objects for which the appropriations were made," 31 U.S.C. § 1301(a), and banning "an expenditure or obligation exceeding an amount available in an appropriation," 31 U.S.C. § 1341(a)(1)(A).

Here, Defendants are doing just that. They are exercising "unbounded power" by obligating the federal treasury, and in fact removing assets from the federal treasury, without legal authority. This violates the specific limitations imposed by the separation of powers, and more specifically, the Appropriations Clause.

Moreover, when Defendants point to a vague statute like the HEROES Act (which, again, is meant to support the men and women of the armed services), and then claim congressional authorization, the limitations of the Major Questions Doctrine are implicated. As explained in more detail below, "extraordinary" claims of executive power must be based on "clear congressional authorization." *West Virginia*, 142 S. Ct. at 2609. By not basing their new spending program on "clear congressional authorization," Defendants are exceeding a "specific constitutional limitation." *Flast*, 392 U.S. at 103.

As *Flast* explained, the "specific constitutional limitation" test is informed by the "specific evils" by "those who drafted" the relevant constitutional restriction "and fought for its adoption." *Id*. at 103–104 (quoting James Madison in the context of the Establishment Clause). It is hard to overstate the importance of the constitutional design restricting the President from exercising a unilateral power over the purse. As Alexander Hamilton succinctly put it, Congress "commands the purse." Federalist, No. 78. James Madison underscored the significance of that exclusive congressional

power, stating, "[t]he power over the purse may [be] the most complete and effectual weapon with which any constitution can arm the immediate representatives of the people." Federalist, No. 58. By invoking the Appropriations Clause, Defendants are clearly alleging a specific limitation on the congressional spending power, like the limitation imposed by the Establishment Clause.

2. **Equal Protection Doctrine.** The Constitution also forbids federal spending based on race without meeting the requirements of strict scrutiny. *See Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 229 (1995). Racially discriminatory intent amounts to a violation of equal protection principles. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977) (collecting cases). Although courts usually do not look to policy motivations, "[w]hen there is a proof that a discriminatory purpose has been a motivating factor in the decision, this judicial deference is no longer justified." *Id.* at 265-66; *see, e.g., Hunter v. Underwood*, 471 U.S. 222, 231 (1985) (Alabama law was unconstitutional because race was a "motivating factor," even though the law was racially neutral on its face); *Reitman v. Mulkey*, 387 U.S. 369, 374 (1967) (striking down provision of California Constitution because its "immediate design and intent" was to permit racial discrimination); *Griffin v. Cnty. Sch. Bd. of Prince Edward Cnty.*, 377 U.S. 218, 231 (1964) (closing schools based on the improper purpose of racial segregation is unconstitutional even though there may be "nonracial grounds" to support the state's position); *Gomillion v. Lightfoot*, 364 U.S. 339, 341 (1960) (plaintiffs may challenge an ordinance changing

municipal boundaries because the purpose of the ordinance was to disenfranchise black residents).

Here, Defendants made clear that one of the purposes of the Student Debt Relief Plan was to support "Black students," "Black borrowers," and "other borrowers of color."[10] In fact, Defendants, in support of this program, even cited a study contending that the student loan forgiveness program would "disproportionately benefit Black borrowers."[11] If the President created a debt relief program to "disproportionately benefit White borrowers," no rational person would claim that such a plan comports with basic principles of equal protection of the laws. "Racial and ethnic distinctions of any sort are inherently suspect and thus call for the most exacting judicial examination." *Miller v. Johnson*, 515 U.S. 900, 904 (1995) (citation omitted). Basic constitutional limitations of equal protection must therefore limit debt relief based on this improper racial motive.

By invoking the Equal Protection doctrine, Plaintiff therefore alleges a second specific constitutional limitation on the congressional spending power, as contemplated by *Flast*.

* * *

In sum, Plaintiff claims taxpayer standing because Defendants have unlawfully exercised congressional spending authority under Article I, § 8, and then evaded specific limitations provided by (1) the Appropriations Clause specifically, and

---

[10] https://www.whitehouse.gov/briefing-room/statements-releases/2022/08/24/fact-sheet-president-biden-announces-student-loan-relief-for-borrowers-who-need-it-most/

[11] https://www.urban.org/urban-wire/more-targeted-approach-student-loan-forgiveness

the separation of powers more generally as articulated by the Major Questions Doctrine and (2) the Equal Protection Doctrine. Doc. 1:¶8. Plaintiff contends that such arguments fit logically within the *Flast* test, but if this Court finds that they do not, then Plaintiff will advocate in good faith for an expansion of *Flast*.

## III. Plaintiff is Likely to Succeed on its Claim that the Student Loan Relief Program Exceeds Defendants' Constitutional and Statutory Authority.

The President's "power, if any, to issue [an] order must stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co.*, 343 U.S. at 585. And an "agency literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). When the President or one of his agencies acts, they most point to "clear congressional authorization." *West Virginia*, 142 S. Ct at 2609.

Here, Defendants do not claim that the President has any constitutional power to wipe a thirteen-figure sum from the balance sheets. That power belongs to Congress. *See, e.g., Agency for Int'l Dev.*, 570 U.S. at 213. Instead, Defendants point to a 9/11-era law, the HEROES Act. *See Notice of Debt Cancellation Legal Memorandum*, 87 Fed. Reg. 52,943 (Aug. 30, 2022). Under the HEROES Act, the Secretary of Education "may waive or modify" any student loan provision that the Secretary "deems necessary in connection with a war or other military operation or national emergency" "to ensure that . . . recipients of student financial assistance" "are not placed in a worse position financially in relation to that financial assistance because of their status as affected individuals[.]" 20 U.S.C. § 1098bb(a)(1)–(2)(A). An "affected individual" is defined to include "an individual who . . . resides or is

employed in an area that is declared a disaster area by any Federal, State, or local official in connection with a national emergency" and an individual who "suffered direct economic hardship as a direct result of a war or other military operation or national emergency, as determined by the Secretary." *Id*. § 1098ee(2). In short, because of COVID-19, Defendants claim the power to forgive up to $1 trillion in student loans.

## A.    The Major-Questions Doctrine Applies

As a threshold matter, the major-questions doctrine unquestionably applies to Defendants' massive $1 trillion student loan forgiveness plan. In *West Virginia v. EPA*, the Supreme Court explained that it "expect[s] Congress to speak clearly if it wishes to assign to an agency decisions of vast economic and political significance." 142 S. Ct. at 2605 (citation omitted). In such cases, "modest words, vague terms, or subtle devices" cannot confer upon the Executive Branch the power to make "a radical or fundamental change" to a statutory scheme. *Id*. at 2609 (citations omitted). The Court presumes that "Congress intends to make major policy decisions itself, not leave those decisions to agencies." *Id*. (citation omitted). In short, in "certain extraordinary cases," executive officials "must point to clear congressional authorization for the power [they] claim[ ]." *Id*. at 2634.

Several factors support the application of this principle to Defendants' student loan cancellation plan. Defendants are unquestionably claiming the authority to resolve a matter of great "economic and political significance." *Id*. at 2608 (citation omitted). And Defendants are attempting to create a program that Congress has

"conspicuously and repeatedly declined to enact itself." *Id.* at 2610; *see, e.g.,* S. 2235, 116th Cong. (2019); H.R. 2034, 117th Cong. (2021) (failed attempts to forgive student loans). Through this One-Time Student Loan Debt Relief Plan, Defendants are also exercising "unheralded power." *id.* at 2610 (citation omitted); *see also NFIB v. OSHA*, 142 S. Ct. 661, 666 (2022) ("It is telling that OSHA, in its half century of existence, has never before adopted a broad public health regulation of this kind"); *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 324 (2014) ("When an agency claims to discover in a long-extant statute an unheralded power to regulate a significant portion of the American economy, we typically greet its announcement with a measure of skepticism.") (citation omitted).

A new $1 trillion government spending program, resting solely upon authority granted to the Secretary of Education to do what he "deems necessary" during a "national emergency," 20 U.S.C. § 1098bb(a)(1)–(2)(A), is precisely the type of policy closely scrutinized by the Supreme Court under the Major Questions Doctrine. *See generally West Virginia*, 142 S. Ct. at 2620 (Gorsuch, J., concurring) (collecting cases applying the Major Questions doctrine).

**B.    Defendants Cannot Point to Any Clear Congressional Authorization for This Debt Forgiveness. On the Contrary, Defendants' Plan Violates Explicit Constitutional Prohibitions.**

Because the Major Questions Doctrine applies, Defendants must now point to "clear congressional authorization." *Util. Air Reg. Grp.*, 573 U.S. at 324 (2014). They cannot. Instead, Defendants point to the HEROES Act. That law provides no "clear congressional authorization." Moreover, in reviewing the purported statutory

authority, courts should employ "skepticism" toward Defendants' claim. *West Virginia*, 142 S. Ct. at 2614.

There are several deficiencies in this argument.

First, the student loan cancellation is not "necessary in connection with a … national emergency." 20 U.S.C. §1098bb(a)(1). Defendants did not announce this program until nearly two-and-a-half years after the pandemic began and a few weeks after the President declared that "[t]he pandemic is over." *See* David Cohen and Adam Cancryn, "Biden on '60 Minutes': 'The Pandemic is over,'" (Politico, Sept. 18, 2022).[12] Even the White House's own press release on the plan did not invoke a "national emergency," but merely mentioned in passing that the plan will "provide more breathing room to America's working families as they continue to recover from the strains associated with the COVID-19 pandemic."[13] A policy to "provide more breathing room" to Americans "as they continue to recover" from a virus hardly sounds like a "war or other military operation or national emergency" mentioned in the HEROES Act.

Second, the student loan cancellation plan is not "necessary to ensure that recipients of student financial assistance . . . are not placed in a worse position financially in relation to that financial assistance because of their status as affected individuals." 20 U.S.C. §1098bb(a)(2)(A). Because of efforts already undertaken by

---

[12] https://www.politico.com/news/2022/09/18/joe-biden-pandemic-60-minutes-00057423

[13] https://www.whitehouse.gov/briefing-room/statements-releases/2022/08/24/fact-sheet-president-biden-announces-student-loan-relief-for-borrowers-who-need-it-most/

Defendants, student loan borrowers have not had to pay anything for three years and had no interest accrued on their loans. According to Defendants' own statements, "since March 2020," Defendants have suspended "repayment of and interest accrual on all Federal loans held by the Department." 87 Fed. Reg. 41,878, 41,884 (July 13, 2022). "No one with federally-held loans has had to pay a single dollar in loan payments."[14] The student debt cancellation plan, therefore, is not "necessary" to ensure borrowers are not in a "worse position" as required by 20 U.S.C. §1098bb(a)(2)(A).

Third, the plan is not limited to "affected individuals." 20 U.S.C. §1098bb(a)(2)(A). The Act defines "affected individuals," in relevant part, as people who (1) "reside[] or [are] employed in an area that is declared a disaster area by any Federal, State, or local official in connection with a national emergency" or (2) "suffered direct economic hardship as a direct result of a war or other military operation or national emergency, as determined by the Secretary." 20 U.S.C. § 1098ee(2)(C)–(D). But Defendants have not restricted debt cancellation to borrowers who have suffered "direct economic hardship as a direct result" of the pandemic. The loan forgiveness applies to everyone, regardless of whether they suffered hardship due to a "national emergency."

The HEROES Act does not grant the President the power to cancel student loans whenever he wants and for whomever he wants. Congress "does not, one might

---

[14] https://www.whitehouse.gov/briefing-room/statements-releases/2022/08/24/fact-sheet-president-biden-announces-student-loan-relief-for-borrowers-who-need-it-most/

say, hide elephants in mouseholes." *Whitman v. Am. Trucking Associations*, 531 U.S. 457, 468 (2001). And it is probably for this reason that attorneys from the previous two administrations both concluded that the President does not have the power to forgive student debts unilaterally. *See* U.S. Department of Education, Memorandum to Betsy DeVos Secretary of Education Re: Student Loan Principal Balance Cancellation, Compromise, Discharge and Forgiveness Authority (Jan. 1, 2021);[15] Gabriel Rubin, Mass Student Debt Cancellation Legally Risky, Says Top Obama Education Lawyer, (Wall Street Journal, May 4, 2022).[16]

Defendants, therefore, have no legal authority to forgive loans and therefore violate the principles of the separation of powers. All spending must be through congressional appropriations, and Defendants violate that simple principle here. *See* Appropriations Clause, Art. I, § 9. In addition, as explained *supra*, by relying on an improper racial motive, Defendants' plan also violates the Constitution's prohibition on racial discrimination. *See Arlington Heights*, 429 U.S. at 265 (collecting cases). Unless Defendants' plan meets strict scrutiny, it cannot be sustained. *See Adarand*, 515 U.S. at 229.

## IV. Plaintiff Will Be Irreparably Harmed if an Injunction is not Granted

Constitutional violations constitute "proof of an irreparable harm." *Preston v. Thompson*, 589 F.2d 300, 303, n.3 (7th Cir. 1978). "It is 'always in the public interest to prevent the violation of a party's constitutional rights.'" *Faust v. Vilsack*, 519 F.

---

[15] https://static.politico.com/d6/ce/3edf6a3946afa98eb13c210afd7d/ogcmemohealoans.pdf

[16] https://www.wsj.com/articles/mass-student-debt-cancellation-legally-risky-says-top-obama-education-lawyer-11651689489?mod=politics_lead_pos6

Supp. 3d 470, 477 (E.D. Wis. 2021) (quoting *Déjà vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cty., Tennessee*, 274 F.3d 377, 400 (6th Cir. 2001)). Here, an injunction would prevent a constitutional violation. Without an injunction Defendants will forgive tens of millions of student loans, possibly costing the federal treasury over $1 trillion. Once these loans are forgiven, a court will not be able to turn back the clock. "Once a loan is forgiven, it cannot easily be undone." *Faust*, 519 F. Supp. 3d at 477–78. In short, without an injunction, the harm will be irreparable.

Moreover, irreparable harm is "harm that cannot be repaired and for which money compensation is inadequate." *Orr v. Shicker*, 953 F.3d 490, 502 (7th Cir. 2020) (citation omitted). "Imposition of monetary damages that cannot later be recovered for reasons such as sovereign immunity constitutes irreparable injury." *Chamber of Com. of U.S. v. Edmondson*, 594 F.3d 742, 770–71 (10th Cir. 2010). Damages are not available in this case because of sovereign immunity: "Federal constitutional claims for damages are cognizable only under Bivens." *Loumiet v. United States*, 828 F.3d 935, 945 (D.C. Cir. 2016). Since monetary relief is not available here, the harm is irreparable.

## V. The Public Interest and Balance of Harms Weigh Heavily in Favor of an Injunction

"Once an applicant satisfies the first two factors, the traditional stay inquiry calls for assessing the harm to the opposing party and weighing the public interest. These factors merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). The "public interest would be served" by an injunction against a constitutional violation. *Preston*, 589 F.2d at 303, n.3.

Finally, an injunction will not cause any harm. With respect to Defendants, the "government suffers no harm from an injunction that merely ends unconstitutional practices and/or ensures that constitutional standards are implemented." *Doe v. Kelly*, 878 F.3d 710, 718 (9th Cir. 2017); *Chabad of S. Ohio & Congregation Lubavitch v. City of Cincinnati*, 363 F.3d 427, 436 (6th Cir. 2004) ("[N]o substantial harm can be shown in the enjoinment of an unconstitutional policy.").

## CONCLUSION

Plaintiffs request that the Court issue a temporary restraining order and preliminary junction enjoining Defendants from cancelling the student loan debts as planned in the "One-Time Student Loan Debt Relief Plan."

In the alternative, if this Court declines Plaintiff's request for a TRO and/or preliminary injunction, Plaintiff respectfully moves for an injunction pending appeal under Fed. R. App. P. 8(a), preventing Defendants from forgiving any student loans under the proposed plan, pending disposition of Plaintiff's motion for an injunction pending appeal to the Seventh Circuit Court of Appeals, and if unsuccessful, to the United States Supreme Court. As explained by this Court in *Faust*, once loans are forgiven they cannot be undone, and so the harm to Plaintiff would be irreparable. A short pause in Defendants' plan is all that is necessary to provide a fair chance to Plaintiff to have this matter reviewed by a higher court.

Dated this 4th day of October, 2022.

WISCONSIN INSTITUTE FOR
LAW & LIBERTY, INC.

s/ *Daniel P. Lennington*

Richard M. Esenberg (WI Bar No. 1005622)
Daniel P. Lennington (WI Bar No. 1088694)

330 E. Kilbourn Avenue, Suite 725
Milwaukee, WI 53202
Telephone: (414) 727-9455
Facsimile: (414) 727-6385
Rick@will-law.org
Dan@will-law.org

*Attorneys for Plaintiff*